## CONCORD RAILROAD v. CLOUGH.

The rules made by the directors of the Concord Railroad required the conductors to collect of passengers paying in the cars ten cents more than the regular fare. One of the conductors, in certain instances, received of such passengers the regular fare without the ten cents extra. In order to conceal this irregularity from the Railroad, he did not return the fares so received on his way-bills, filed in the ticket-master's office, from day to day, and pay over the same to the ticket-master, as by the rules of the Railroad, of which he had knowledge, he was required to do. With the money so taken he bought tickets, at the ticket office, and, after punching them so as to show that they had been used, returned them to the ticket-master with the tickets taken up in the regular course of business, and, in this way, the money all came into the possession of the railroad. This was done with the knowl-

---

*Note. See, also, chap. 2625, laws of 1862, and act of July 6, 1867. Chap. 2622 was enacted in consequence of the decision in *Webber* v. *Chapman*, and was intended to reverse the rule laid down in that case. It passed the House without question. But its passage was arrested in the Senate, because of the supposition that it was merely an affirmance of the common law, and, therefore, unnecessary;—the opinion in *Webber* v. *Chapman*, not having been published. As soon as the doctrine of that case was known, the act was taken from the table and immediately passed. The facts are stated, because they are peculiarly within the personal knowledge of the

REPORTER.

edge and consent of the superintendent, but with the understanding and agreement between him and the conductor that the whole transaction should be concealed from the corporation and its directors, and it was so concealed.

*Held*, that this did not constitute a payment by the conductor to the railroad of the fares taken in the cars, and that the railroad could recover these fares of the conductor in assumpsit for money had and received.

An agent of the Concord Railroad, whose duty it was to sell tickets issued by that road, for his own profit purchased joint tickets issued by other roads under a contract with the Concord Railroad, entitling the holder to a passage on the Concord Railroad, and sold these tickets to passengers who would otherwise have bought the tickets issued by the Concord Railroad, and entrusted to the agent for sale. The Concord Railroad derived a larger profit from its own tickets, than from the joint tickets issued by other roads.· The agent bought and sold the joint tickets with the knowledge and consent of the superintendent of the Concord Railroad, but the corporation and its directors had no actual knowledge of it.

*Held*, that the Concord Railroad could recover of the agent, in assumpsit for money had and received, the profits made by him in thus buying and selling the joint tickets.

### STATEMENT OF FACTS.

ASSUMPSIT upon the common counts, by the Concord Railroad against George Clough, a former conductor on the Concord Railroad. The questions arose upon the report of the referees, who, after making an absolute award in favor of the plaintiff for five thousand six hundred and thirty-five dollars, ($5635.) made the following conditional awards.

The referees find the following facts, and award, as the court shall shall determine the law, viz.: "The defendant, in certain instances, received of passengers paying in the cars, less than the full fares, and, in order to conceal this irregularity from the plaintiff, did not return the fares so received on his way-bills, filed in the ticket-master's office, from day to day, and pay over the same to the ticket-master, as by the rules of the plaintiff, of which he had knowledge, he was required to do. The defendant's own testimony tended to show that with the money so taken, he bought tickets at the ticket-office, and, after punching them so as to show that they had been used, returned them to the ticket-master, with the tickets taken up in the regular course of business, and that, in this way, ·the money all came into the plaintiff's possession, This was done with the knowledge and consent of Mr. Gilmore, the superintendent of the plaintiff's road, but with the understanding· and agreement between him and the defendant, that the whole transaction should be concealed from the plaintiff and its directors, and it was so concealed. The plaintiff, ascertaining that money received by the defendant of passengers paying their fares in the cars had not been returned on the way-bills and paid over to the ticket-master, and never having had

any knowledge or given any assent to any other mode of paying over, commenced this action, in good faith, and thereby changed its position in a material matter. If the defendant is estopped from showing by way of defence, that the money came into the plaintiff's possession as above mentioned; or, if such facts being shown would not constitute a defense, then, and not otherwise, the referees further award that the plaintiff recover of the defendant, the additional sum of five thousand five hundred and nine dollars. The plaintiff had contracts with other railroad corporations, by virtue of which such other corporations issued what are called joint tickets, entitling passengers to be carried over the plaintiff's road and the roads of other corporations. To these tickets coupons were attached for each road, and the conductor on each road took off the coupon belonging to his road, when the holder passed over such road. It often happened that holders of such tickets from northern and western roads to Boston, over the plaintiff's road, left the train before passing over the plaintiff's road, and sold the balance of their tickets to other persons, who used them. It was a part of the defendant's duty, as a servant and agent of the plaintiff, to sell tickets from Concord and other stations on the plaintiff's road to Boston and other places, and he was furnished with tickets for that purpose. The defendant, for his own profit, purchased such joint tickets from northern and western roads, from which the coupons prior to the plaintiff's had been taken, and sold them to the passengers in the cars, who would otherwise have bought the joint tickets of the plaintiff entrusted to the defendant for sale. This was injurious to the plaintiff's business entrusted to the defendant, and deprived the plaintiff of the whole or some part of the profits which should have been received from the sale of its own tickets, the plaintiff deriving a larger profit from its own tickets, than from those of other roads. This was done with the knowledge and consent of Mr. Gilmore, the superintendent of the plaintiff's road, but the plaintiff's directors and the plaintiff had no actual knowledge of it. If the plaintiff is entitled by law to recover in this action, the profits made by the defendant in thus buying and selling the joint tickets, the referees further award that the plaintiff recover the additional sum of two thousand dollars."

*John H. George, C. W. Stanley, and L. W. Clark,* for plaintiff.

*M. W. Tappan, J. Y. Mugridge and H. P. Rolfe,* for defendant.

\* SMITH, J.    It seems to be conceded on both sides that the directors of the Concord Railroad made a rule that passengers, who, having neglected to purchase tickets, paid their fares in the cars, should be charged ten cents extra; that the defendant had notice of this regulation; and that the instances referred to in which the de-

---

\* Bellows, C. J. and Foster, J., did not sit.

fendant received of passengers paying in the cars less than the full fares, were instances where the defendant collected the price of a ticket, but failed to collect the ten cents extra required by the rule.

The first question arising upon the report, is, whether the superintendent's knowledge and consent, justified the defendant in disregarding the rule made by the directors.

If the superintendent had any power to suspend or waive the rule, he certainly had not the power to do it in the manner stated in the report. If he had any authority of the kind, it must have been authority to do the act openly, and not to disregard the rule with the understanding that such disregard should be concealed from the directors. Such conduct on the superintendent's part was not within the shadow of any apparent authority he possessed, and was probably understood by both the superintendent and the conductor as a fraud on the directors, an evasion, rather than, a suspension of the rule. If the superintendent's attempted authorization afforded no justification of the defendant, his knowledge and acquiescence can have no greater effect.

Is the defendant liable for the money taken in the cars and not returned according to the rules?

The money taken by the defendent in the cars was received by him to the plaintiff's use; and he is liable for it in this action, unless he has paid it over to the plaintiff, or disposed of it in some manner equivalent in law to payment. Although this money came ultimately into the plaintiff's possession, it was not paid to it as being money which it was entitled to receive as its own, without giving anything in exchange for it. On the contrary, it parted with a full equivalent in tickets, which constituted a valuable consideration. There was nothing in the contract, whereby the tickets were purchased, to prevent the defendant from using or re-selling them. He did not intimate to the plaintiff that the money thus expended in the purchase of tickets was its money; nor that he intended to hold the tickets in trust for it, to be cancelled and returned unused. Therefore, when he had paid the money for the tickets and had received the latter, it could not be said that he had, as the plaintiff's agent, paid over the money to the plaintiff, or that the plaintiff had received the beneficial interest of the fares taken in the cars. The plaintiff had, indeed, received the money, but it had received it as the consideration for parting with valuable property, and not as a debt to which it was entitled.

The subsequent fact, that the defendant, after receiving the tickets, returned them to the plaintiff unused, (but so mutilated that they could not be sold again by the plaintiff,) does not vary the legal aspect of the case. Even if the plaintiff realized a net profit equal in amount to the fares represented by the tickets deducting the cost of printing and selling, still this donation of tickets was not a payment to the plaintiff of its money in the defendant's hands. The defendant had treated that money as his own; and, although he had appropriated it in a manner which may, perhaps, seem more

beneficial to the plaintiff than to himself, it was none the less a misappropriation and cannot be regarded as constituting a payment. In using the money to buy tickets, the defendant was assuming a dominion over the money, and dealing with it in a manner, wholly inconsistent with the property of the plaintiff in it.     He could not apply the money in a way which was against the wishes of the owners, (although it might be beneficial to them,) and then claim that he had thereby paid the money to them.    The plaintiff could not have been obliged to accept, and did not accept, the mutilated tickets as payment of the fares collected by the defendant.    It had no notice that the return of the tickets was intended to have such operation or effect.

If A has in his hands a ten-dollar bill which he has received to B's use, and, instead of paying it to B, as B's money, chooses to purchase of B a barrel of flour for which he pays B the ten-dollar bill, and immediately thereafter, A makes a present of the flour to B, there is no just sense in which A can be said to have performed his contract to pay the ten dollars to B.    *Non constat*, that B, had he    . known A's purpose, would have chosen to accept this roundabout method of benefiting him in a manner wholly inconsistent with the contract.

It may perhaps be urged that a decision proceeding on the grounds above indicated, will work great practical injustice to the defendant. But, after much consideration, we are unable to discover such moral or equitable considerations in the defendant's favor, as entitle him to ask to be relieved from the application of the general principles of law to his case.    The rule of the corporation was enacted for the obvious purpose of diminishing the chances for peculation by conductors.    If conductors could not carry out the rule, they could have resigned.    The defendant deliberately violated the rule.    To conceal the violation, he adopted this plan of buying and mutilating, and then returning tickets.    By this means, the plaintiff lost the ten cents extra, and the cost of printing these tickets.    But it also lost something more valuable than these two items; it was deprived of the benefit which would have resulted from fully carrying out the system of the rule.    Every passenger who paid in the cars without paying the ten cents extra, was thereby emboldened to neglect next time to purchase tickets.    Thus the defendant's method encouraged the very practice which the rule was intended to discourage.    Supposing the defendant himself to be honest, and certain to account in this way for all he received, still the effect on the other conductors could hardly fail to be bad.    The neglect of one conductor to collect the ten cents extra, would tend to increase on all the trains the number of passengers paying in the cars; and while the temptation and opportunity to cheat were thus increased, the defendant's returns on his way-bills would probably lead persons who examined them to conclude that the defendant was keeping back part of his collections. It is not unreasonable to suppose that the other conductors would learn the amount returned on the defendant's way-bills, and be influenced by that knowledge.

In action of trover, the return of the property converted may be shown in mitigation of damages. But we are not aware that this principle has been carried to the extent of permitting the delivery by the defendant to the plaintiff of a chattel other than the one converted to go in mitigation. If A, having converted B's cow to his own use, exchanges it for a horse, and subsequently delivers this horse to B, under such circumstances that B has no reason to believe A intends the horse to go in satisfaction or mitigation of the conversion of the cow, the delivery of the horse could hardly have that effect.

Where property converted has been sold and the proceeds applied to the payment of a debt due from the plaintiff, such application generally goes in mitigation of damages. The law assumes that it is doing a man no serious injury to apply his property in payment of a debt which might have been satisfied out of the same property if it had remained in the debtor's possession. The chattels "revert to the plaintiff's benefit as much as if they had been returned." If, however, the property was such that if returned, it could not have been applied in that way without the owner's consent (*e. g.* property exempt from levy), such application by the defendant cannot be shown in mitigation. See *Hill* v. *Loomis*, 6 N. H. 263 ; *Peverly* v. *Sayles*, 10 N. H. 356.

But in the present case, the defendant did not apply either the money or tickets to discharge any existing liability of the plaintiff, nor did he apply the money itself to the plaintiff's use. He did undertake to apply the property purchased with the money in a manner which he probably considered beneficial to the plaintiff, and he intended this as an indirect performance of his contract to pay over the money. But this, as he must have been well aware, was not a performance of the contract, and could not avail unless it was accepted by the plaintiff, with a knowledge of the facts, as a performance. Any other view would rest upon the assumption, that a promisor may alter or vary the terms of a contract without the consent of the promisee. If the plaintiff had had cause to believe, that the return of the mutilated tickets was intended by the defendant in discharge or part performance of his obligation to return the money, and, so believing, had received the tickets without manifesting any dissent, that would have furnished evidence of a waiver by both contracting parties of the mode of performance contemplated by the contract and the substitution and acceptance of the method adopted by the defendant. But, in fact, the plaintiff did not understand the defendant's intention, and the defendant did not mean it should. The defendant meant that the plaintiff should believe, and it did believe, that these tickets had been received by the defendant from passengers in the cars ; not that the tickets had been purchased with fares collected by the defendant, and that their surrender to the plaintiff was intended by him as equivalent to a return of those fares. We cannot assume that the plaintiff, if it had known the facts, would have assented to this mode of payment. Indeed, an opposite inference is almost unavailable. When the

defendant adopted this mode of payment, he chose to run the risk of the plaintiff's refusing to accept it as a performance.

It has been held, by a high authority, that a servant who clandestinely takes his master's grain is guilty of larceny, notwithstanding his intent in taking was to give it to his master's horses. *Rex* v. *Brivett*, 2 Car. & Kir. 114; *Rex* v. *Morfit*, 1 1 R. & Ry. C. C. 307; Lead. Crim. Cases, 1st Ed. 438. If the intent to apply the grain to feed the owner's horses does not protect the servant in such a case, it would seem that the application of the tickets to the plaintiff's benefit cannot avail as satisfaction of a contract to pay over the money with which the tickets were purchased. The principle in both cases is that the owner of property has generally a right to elect the nature or description of benefit which he will derive from its use, and no other person can make that election for him, save at his peril, if he does not adopt his choice.

It may be said that the plaintiff will recover damages greatly in excess of the injury sustained. But this does not appear. The injury caused to the plaintiff's general business by the precedent which the defendant set in evading its rule, cannot easily be estimated; but it is certainly conceivable that it may have been greater in amount than the value of the tickets returned by the defendant.

As we are of opinion that the facts "being shown," do not constitute a defence, it is unnecessary to inquire, whether the defendant is estopped from showing these facts.

The superintendent's knowledge and consent do not justify the defendant's acts in purchasing and selling the "joint tickets." In that transaction the defendant was competing with and injuring the business of his employer. If, in the absence of any statement on that point, we are to infer that Mr. Gilmore had all the authority usually conferred upon railroad superintendents, still it is not within the ordinary authority of such officials to empower employees of the road to make use of their position as employees to compete with and injure the business of their employer. The purchase and resale of these "joint tickets" constituted a breach of trust, and the defendant is chargeable for the profits just as he would have been for profits made by speculating with money received for fares. In equity and good conscience, these profits are so much money had and received by the defendant to the plaintiff's use.

The result is, that, for all the sums awarded, there must be

*Judgment for plaintiff.*